**GOLDBERG & OSBORNE**
**698 E. Wetmore Road, Suite 200**
**Tucson, AZ 85705**
**(520) 620-3975**

**David J. Diamond, Esq.**
**Ddiamond40@aol.com**

**D. Greg Sakall, Esq.**
**gsakall@aol.com**
**Attorneys for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN KRUGER and HEATHER KRUGER, husband and wife, | MDL No. 2545 |
| | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiff, | |
| vs. | |
| ACTAVIS, INC. and WATSON PHARMACEUTICALS, INC. | |
| Defendants. | |

## COMPLAINT

Plaintiffs, Kevin Kruger and Heather Kruger, ("Plaintiffs") by and through their undersigned counsel, hereby sue Defendants Actavis, Inc. and Watson Pharmaceuticals, Inc. ("Defendants") and allege as follows:

### INTRODUCTION

1.     This case involves the prescription drug Androderm, which is manufactured, sold, distributed and promoted by Defendants Actavis, Inc. and Watson Pharmaceuticals, Inc. as a testosterone replacement therapy.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

2.      Defendants misrepresented that Androderm is a safe and effective treatment for hypogonadism and a condition they referred to as "Low T," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

3.      Androderm causes an increase in hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks, ischemic stroke, and numerous types of cardiovascular injuries.

4.      Defendants failed to adequately warn physicians about the risks associated with the Androderm and the monitoring required to ensure their patients' safety.

5.      Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for Androderm. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T", an abbreviated term for low testosterone.

6.      According to the industry-leading Androgen Deficiency in Adult Males ("ADAM") or "Is it Low T?" quiz, the symptoms of "Low T" include being "sad or grumpy," "experiencing deterioration in the ability to play sports," and "falling asleep after dinner." *Available at*: http://www.isitlowt.com/do-you-have-low-t/low-t-quiz. Most doctors agree that these symptoms can be caused by an abundance of factors, the most prominent of which is the natural aging process.

7.      The FDA has not approved any testosterone replacement therapy drug as a treatment for "low testosterone" or "Low T." Additionally, "Low T" is not a disease recognized by the medical community.

2

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

8.     As a result of this "disease mongering," as termed by Dr. Adriene Fugh-Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially. This has directly related to Androderm's sales increasing to over $1.37 billion per year.

9.     Consumers of Androderm relied on the companies false representations and were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

## PARTIES

10.     Plaintiffs Kevin Kruger and Heather Kruger are and were at all times relevant hereto, residents of Beaver Dam, Wisconsin.

11.     Defendant Actavis, Inc. is and at all times relevant was, a corporation organized and existing under the laws of the State of New Jersey, having a principal place of business at 400 Interpace Parkway, Parsippany, NJ 07054.

12.     Defendant Watson Pharmaceuticals, Inc. is and at all times relevant was, a corporation organized and existing under the laws of the State of New Jersey, having a principal place of business at 400 Interpace Parkway, Parsippany, NJ 07054.

## JURISDICTION AND VENUE

13.     Subject matter of this action arises under 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendants because Defendants have significant contacts with this District such that they are subject to personal jurisdiction within this District.

15.     Venue of this case is appropriate in the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to Judge Matthew F. Kennelly's Order,

3

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

1  which permits directly filing into the District of Illinois, Eastern Division, under Case MDL No.

2  2545, *In re: Testosterone Replacement Therapy Products Liability Litigation.*

3  **GENERAL ALLEGATIONS**

4  16.  This action is for damages brought on behalf of the Plaintiff Kevin Kruger, who

5  was prescribed and supplied with, received and who has taken and applied the prescription drug

6  Androderm, as tested, studied, researched, evaluated, endorsed, designed, formulated,

7  compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed,

8  labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the

   stream of interstate commerce by Defendants.

9  17.  This action seeks, among other relief, general and special damages and equitable

10 relief in order to enable the Plaintiff Kevin Kruger to treat and monitor the dangerous, severe

11 and life-threatening side effects caused by this drug.

12 18.  Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused

13 Plaintiff's injuries and damages.

14 19.  At all times herein mentioned, Defendants were engaged in the business of, or

15 were successors in interest to, entities engaged in the business of research, licensing, designing,

16 formulating, compounding, testing, manufacturing, producing, processing, assembling,

17 inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or

18 selling the prescription drug Androderm for the use and application by men, including, but not

   limited to, Plaintiff Kevin Kruger.

19 20.  At all times herein mentioned, Defendants were authorized to do business within

20 Plaintiff's state of residence, and throughout the United States.

21 21.  At all times herein mentioned, the officers and directors of Defendants participated

22 in, authorized, and directed the production and promotion of the aforementioned product when

23 they knew, or with the exercise of reasonable care should have known, of the hazards and

24

25

4

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

22.     Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that said drug caused the appreciable harm sustained by Plaintiff Kevin Kruger. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of Plaintiff Kevin Kruger's injuries as their cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, that Plaintiff Kevin Kruger had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiffs were prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that the drug Androderm is safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiffs to discover a potential cause of action.

## OVERVIEW

23.     Androderm is Defendants' trade name for their testosterone transdermal system (patch) designed to deliver testosterone continuously for 24 hours following application to intact, non-scrotal skin (e.g., back, abdomen, thighs, and upper arms).

24.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

25.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

26.     In men, testosterone levels normally begin a gradual decline after age thirty.

27.     The average testosterone levels for most men range from 300 to 1,000 ng/dl of blood. However, testosterone levels can fluctuate greatly depending on many factors, including

sleep, time of day, and medication. Resultantly, many men who may have testosterone levels below 300 ng/dl on one day will have normal testosterone levels the next. Additionally, testosterone levels gradually decline as men age. This decline in serum testosterone levels is a normal process that does not represent a medical condition or disease.

28. The Food and Drug Administration approved Androderm in September 1995 as a form of testosterone replacement therapy for the treatment of adult males who have low or no testosterone, a condition called hypogonadism. After FDA approval, Androderm was widely advertised and marketed by Defendants as a safe and effective testosterone replacement therapy.

29. Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone.

30. In 1999, Unimed Pharmaceuticals Inc. - another manufacturer of testosterone replacement therapies - asserted that hypogonadism was estimated to affect approximately "one million American men."

31. In 2000, Unimed announced that the market had increased from one million men to "four to five million American men." By 2003, the number again increased to "up to 20 million men."

32. However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001 - 2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

33. Defendants coordinated a massive advertising campaign targeted toward men who did not have hypogonadism, nor had low or no testosterone in conjunction with an associated medical condition. The direct-to-consumer marketing was designed to convince men that they

6

suffered from a non-existent and unrecognized medical condition called "Low T", which was a term Defendants created for the symptoms experienced by men as a result of normal aging.

34.     Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential Androderm users, and online media including the unbranded website "IsItLowT.com."

35.     The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

36.     Defendants' national education campaign included the creation and continued operation of the website www.IsItLowT.com. The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is it Low T' Quiz." The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone, including "Have you experienced a recent deterioration in your ability to play sports?", "Are you falling asleep after dinner?", "Are you sad and/or grumpy?", and "Do you have a lack of energy?"

37.     Dr. John Morley, director of endocrinology and geriatrics at the St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company Organon BioSciences, in exchange for a $40,000 grant to his university. The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy." Dr. Morely drafted the questionnaire in 20 minutes in the bathroom,

7

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

scribbling the questions on toilet paper and giving them to his secretary the next day to type up. Dr. Morely admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal." This is the "Low T Quiz" used on the "IsItLowT" website. Natasha Singer, *Selling that New-Man Feeling*, Nov. 23, 2013, N.Y. TIMES.

38. Since the FDA approved Androderm for hypogonadism, Defendants have also sought to convince primary care physicians that hypogonadism is synonymous with "Low T," that low testosterone levels are widely under-diagnosed, and that normal and common conditions associated with normal aging could be caused by low testosterone levels.

39. While running their disease awareness campaign, Defendants promoted their product Androderm as an easy-to-use transdermal testosterone replacement therapy. Defendants contrast their product's at-home application with less convenient prescription testosterone injections, which require frequent doctor visits.

40. Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

41. Defendants successfully created a robust and previously nonexistent market for their drug, spending millions on unbranded marketing, including commercials and websites, www.IsItLowT.com and www.DriveForFive.com. These sites recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

42. The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the

8

use of Androderm is safe for human use, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

43. Defendants' advertising paid off. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?,* May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

44. There have been a number of studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

45. Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

46. The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and it also results in an increase in hematocrit and serum estradiol levels.

47. Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44%-48%.

48. The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process of erythrocytosis. An increase of

9

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia. This is a serious medical condition that requires treatment to prevent injury.

49.     Elevated hematocrit is an independent risk factor for stroke, and it interacts synergistically with elevated blood pressure. In a published study the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

50.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events. Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure. In 3,523 Framingham participants, aged 50-65, who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.

51.     In another study of 680 males conducted over 28 years in Finland, the data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels of less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.

52.     In yet another large, prospective study in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

10

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

53.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of 1 unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual. An increase in blood viscosity is a known risk factor for ischemic heart disease, and it can cause hypertension as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

54.     The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by transdermal application, topical application, or injection, some of that testosterone is converted by the body (aromatized) to estradiol. The increase of estradiol is in direct relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.

55.     In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower. This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles. Atrial fibrillation is a known cause of thrombus formation.

56.     If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, then the estradiol can interact with the

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.

57.     In a study published 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude, "circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men." These findings of a positive association between serum estradiol levels and intima-media thickening supports the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis in men.

58.     In a case control study of men in the Framingham cohort *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.

59.     Estradiol has a direct effect in the male heart through the regulation of gene expression that it does not in female hearts. This effect results in impaired contractile function of the heart in males with elevated levels of serum estradiol.  Impaired contractile function results in numerous cardiovascular injuries and disease.

60.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

61.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels", in which a large cohort of men who used testosterone taken from a database of the Veteran's Administration was compared against a cohort of men who did not use

12

testosterone. The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

62.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a comorbid condition.

63.     In some patient populations, testosterone use can increase the incidence of adverse events and death by over 500%.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

64.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of their product.

65.     Defendants successfully marketed Androderm by undertaking a "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

66.     Defendants' advertising program, sought to create the image and belief by consumers and their physicians that the use of Androderm was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these claims to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

67.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Androderm. Defendants deceived potential Androderm

13

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

68. Defendants concealed material relevant information from potential Androderm users and minimized user and prescriber concern regarding the safety of Androderm.

69. In particular, in the warnings Defendants gave in their commercials, online and print advertisements, Defendants failed to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represented that Androderm had been tested for all likely side effects. Defendants also failed to warn and instruct regarding the importance of adequate monitoring of hematocrit levels.

70. Androderm's warnings and medication guide contained within the package materials do not warn against stroke, pulmonary embolism, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

71. The warnings and medication guide contained within the package materials instruct patients to tell their healthcare provider the following before initiating use of Androderm:

- have breast cancer
- have or might have prostate cancer
- have urinary problems due to an enlarged prostate
- have heart problems
- have kidney or liver problems
- have problems breathing while you sleep (sleep apnea)
- have any other medical conditions

14

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

However, it fails to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. It also fails to instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

72. The warnings and medication guide contained within the package materials do warn that the use of the product may result in increased red blood cell count, but does not instruct physicians or patients that it can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count does not warn patients that hematocrit levels can rise by as much as 10% above normal range, nor does it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%.

73. The warnings and medication guide contained within the package materials do warn that use of the product may result in risk of blood clots in the veins, but it specifically limits this warning to "blood clots in the legs" and only warns against blood clots in the legs that form as a result of increased red blood cell count (polycythemia). There is no warning for blood clots in the veins other than "blood clots in the legs", nor is there any warning of blood clots resulting from causes other than polycythemia. Also, there are no warnings against blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

74. The warnings and medication guide contained within the package materials fail to warn that use of the product may result in elevated levels of estradiol. They do not instruct physicians to monitor estradiol levels, nor do they provide any guidance to physicians or

15

patients regarding the significant health risks associated with elevated levels of serum estradiol in men.

75. The warnings and medication guide contained within the package materials do not warn that use of the product may result in the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol, or any other cause unrelated to polycythemia.

76. The warnings and medication guide contained within the package materials do not offer any warning of the very serious health risks for men over the age of 65 who use testosterone replacement therapy. Instead, the label only states that the manufacturer lacks any information regarding the safety or efficacy of testosterone therapy for men over the age of 65. This absence of a warning fails to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population, despite the fact that this data has been published and available in the medical community for years.

77. On June 19, 2014, the United States Food & Drug Administration issued a statement requiring manufacturers of testosterone requiring to include a general warning in the drug labeling of all approved testosterone products about the risk of blood clots in the veins. Blood clots in the veins, also known as venous thromboembolism (VTE), include deep vein thrombosis (DVT) and pulmonary embolism (PE). The risk of venous blood clots is already included in the labeling of testosterone products as a possible consequence of polycythemia, an abnormal increase in the number of red blood cells that sometimes occurs with testosterone treatment. Because there have been post-market reports of venous blood clots unrelated to polycythemia, FDA is requiring a change to drug labeling of all testosterone products to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products.

16

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

78.     As a result of this mandate by the FDA, Defendants have updated their warnings as follows: "Blood clots in the legs or lungs. Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness. Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain." However, it still lacks any warning about the risks of elevated estradiol levels, and it contains no warnings for strokes or cardiovascular injuries.

79.     A careful review of the warnings, labeling and instructions provided by Defendants for the use of Androderm prior to June 21, 2014, would lead a reasonable physician and/or patient to believe that the only risk associated with the use of the product is an increase in red blood cell count and the possibility of a blood clot in the leg. This is misleading and fails to adquately warn physicians and patients about the numerous, life-threatening health risks associated with use of the drug.

80.     As a result of Defendants' advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for Androderm. If Plaintiffs had known the risks and dangers associated with Androderm, Plaintiff Kevin Kruger would not have taken Androderm and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

81.     Plaintiff Kevin Kruger was approximately 37 years old when he was prescribed and used Androderm for symptoms he and his physician attributed to low testosterone as a result of Defendants' advertisements, promotion, and statements made from sales representatives.

82.     After taking multiple doses of Androderm, in or about November, 2011, Plaintiff Kevin Kruger was diagnosed with a pulmonary embolism, which necessitated substantial treatment.

83.     The Androderm Plaintiff consumed caused physical and emotional impairment, which affected his personal and professional life.

17

84.     Plaintiff incurred significant medical expenses as a result of the treatment he underwent. He will incur future medical expenses, as well as lost wages resulting from being unable to work. His ability to labor and earn money has been impaired, he is at increased risk for future health problems and disability, and he suffered physical pain and mental anguish.

85.     There was no warning to Plaintiff or his physicians that the product presented the risk of harm from which Plaintiff suffered as a result of its use.

86.     Had Plaintiff Kevin Kruger known the true risks associated with the use of testosterone medications, including Androderm, he would not have consumed the Androderm and would not have incurred the injuries or damages he did as a result of his use of Androderm.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

87.     Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

88.     The Defendants are liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement of Torts 2d.

89.     The Androderm manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

90.     Defendants failed to adequately warn consumers and/or their health care providers that Androderm could cause increased hematocrit levels that could cause heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots.

92.     Defendants failed to adequately warn consumers and/or their health care providers that while a patient was taking Androderm it was necessary to frequently monitor hematocrit

18

levels to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events and blood clots.

93.     The Androderm manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Androderm, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

94.     As a direct and proximate result of Plaintiff's reasonably anticipated use of Androderm as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY DESIGN DEFECT

95.     Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if stated herein.

96.     Androderm is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or that the foreseeable risks exceed the benefits associated with its design and formulation.

97.     At all times material to this action, Androderm was expected to reach, and did reach, consumers in the State of Wisconsin and throughout the United States, including Plaintiff Kevin Kruger, without substantial change in the condition in which it was sold.

98.     At all times material to this action, Androderm was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by the Defendants in a defective and unreasonably dangerous condition at the time it was placed in the

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

19

stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

      a.     When placed in the stream of commerce, Androderm contained unreasonably dangerous design defects and was not reasonably safe for its intended use, subjecting Kevin Kruger to risks that exceeded the benefits of the subject product including, but not limited to, permanent personal injuries including, but not limited to, developing cardiovascular disease, strokes, myocardial infarctions, and other serious injuries and side effects;

      b.     When placed in the stream of commerce, Androderm was defective in design and formulation, making the use of Androderm more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other medications and similar drugs on the market to treat low testosterone;

      c.     The design defects found in Androderm existed before it left the control of the Defendants;

      d.     Androderm was insufficiently and inadequately tested;

      e.     Androderm caused harmful side effects in Plaintiff Kevin Kruger and the public as a whole that outweighed any potential utility; and

      f.     Androderm was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Plaintiff Kevin Kruger, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiffs.

      99.     In addition, at the time Androderm left the control of Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff Kevin Kruger's injuries without impairing the reasonably anticipated or

20

intended function of the product. These safer alternative designs were economically and technologically feasible and would have prevented or significantly reduced the risk of Plaintiff Kevin Kruger's injuries without substantially impairing the products' utility.

## THIRD CAUSE OF ACTION
## NEGLIGENCE

100. Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

101. At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Androderm.

102. At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Androderm and failed to adequately test and warn of the risks and dangers of Androderm.

103. Despite the fact that Defendants knew or should have known that Androderm caused unreasonable, dangerous side effects, Defendants continued to market Androderm to consumers including Plaintiff Kevin Kruger, when there were safer alternative methods and/or no need to treat conditions such as loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions that Androderm marketing materials claim are caused by "Low T".

104. Defendants knew or should have known that consumers such as Plaintiff Kevin Kruger would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

21

105.   Defendants' negligence was a proximate cause of the Plaintiff's injuries, harm and economic loss which Plaintiffs suffered, and will continue to suffer, as described and prayed for herein.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**

106.   Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

107.   Prior to the time that the aforementioned products were used by Plaintiff Kevin Kruger, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Androderm was of merchantable quality and safe and fit for the use for which it was intended.

108.   Specifically, Defendants warranted to Plaintiff that their product was intended to treat a condition called "Low T" and that it was safe and fit for that use, but Defendants failed to disclose that "Low T" is not a recognized medical condition and that their testosterone product was not FDA approved to treat any such condition.

109.   Plaintiffs were and are unskilled in the research, design and manufacture of medical drugs, including Androderm, and reasonably relied entirely on the skill, judgment and implied warranty of Defendants in using Androderm. As a result, Plaintiff Kevin Kruger used Defendants' product as it was warranted to be intended.

110.   Androderm was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Androderm has dangerous propensities when used as intended and will cause severe injuries to users.

111.   As a result of the abovementioned breach of implied warranties by Defendants, Plaintiffs suffered injuries and damages as alleged herein.

22

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

112. Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

113. At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Androderm was FDA approved to treat a condition called "Low T", and that it is safe, effective, fit and proper for its intended use. Plaintiff purchased Androderm relying upon these warranties.

114. In utilizing Androderm, Plaintiffs relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that there is no disease or medical condition called "Low T" that is recognized by any medical community, peer-reviewed journal, or learned treatise, and that Androderm is unsafe and unfit for its purported intended uses.

115. As a result of the abovementioned breach of express warranties by Defendants, Plaintiff Kevin Kruger suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION
## FRAUD

116. Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

117. Through a sophisticated and well-orchestrated marketing campaign, Defendants set out to invent a fictitious disease/medical condition that it called "Low T", and then purposely

23

deceived Plaintiffs into believing that this was a real disease/medical condition and that Plaintiff Kevin Kruger suffered from it. Defendants did this through marketing a set of generic and common conditions in middle-aged men, and representing that these conditions were "symptoms" of "Low T". Those commonly occurring conditions were listed in the "Is It LowT Quiz", and included:

- Being tired after dinner
- Diminished ability to play sports
- Lack of energy
- Being sad
- Being grumpy
- Decreased libido

Each of these purported "symptoms" of "Low T" are normal and common conditions for men over the age of 40, and especially common in men over the age of 50.

118. Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Androderm, and up to the present, knew that 9% of the subjects in its clinical trial experienced an increase in hematocrit to a level that more than double their risk for stroke, heart attack, and clot formation that could result in pulmonary embolism, and as result of published, peer-reviewed medical literature new that the use of its product could result in a dramatic increase in serum estradiol levels, yet Defendants willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Androderm, which Defendants had a duty to disclose.

119. At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Androderm and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Androderm. Defendants knew of the foregoing, that Androderm is not safe, fit and effective for

24

human consumption, that using Androderm is hazardous to health, and that Androderm has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff Kevin Kruger suffered.

120.   Defendants concealed and suppressed the true facts concerning Androderm, and the actual disease for which it has been FDA approved to treat (hypogonadism), with the intent to defraud Plaintiffs, in that Defendants knew that Plaintiff's physicians would not prescribe Androderm, and Plaintiff would not have used Androderm, if they were aware of the true facts concerning its dangers.

121.   Plaintiffs relied on the fraudulent and deceptive representations made by the Defendant to his detriment. Specifically, Plaintiffs relied on representations that "Low T" was an actual disease that required medical treatment and use of prescription testosterone, that Androderm was FDA approved to treat a condition called "Low T", and that Defendants' testosterone drug was a safe and effective treatment for his "Low T".

122.   As a result of Defendants' fraudulent and deceitful conduct, Plaintiffs suffered injuries and damages as alleged herein.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

123.   Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

124.   From the time Androderm was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that "Low T" was an actual disease/medical condition for which medical treatment was indicated, and that Androderm was safe, fit, effective, and FDA approved

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

for human consumption to treat "Low T". At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Androderm and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

125.  Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

126.  The representations by Defendants were in fact false, in that Androderm is not safe, fit and effective for human consumption, using Androderm is hazardous to health, and Androderm has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff Kevin Kruger.

127.  The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Androderm.

128.  Plaintiffs relied on the misrepresentations made by Defendants to his detriment. Specifically, Plaintiffs relied on representations that "Low T" was an actual disease that required medical treatment and use of prescription testosterone, that Androderm was FDA approved to treat a condition called "Low T", and that Defendants' testosterone drug was a safe and effective treatment for his "Low T".

129.  In reliance of the misrepresentations by Defendants, and each of them, Plaintiff Kevin Kruger was induced to purchase and use Androderm. If Plaintiff Kevin Kruger had known of the true facts and the facts concealed by Defendants, Plaintiff would not have used Androderm. The reliance of Plaintiffs upon Defendants' misrepresentations was justified

26

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

130.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff Kevin Kruger suffered injuries and damages as alleged herein.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENCE PER SE—VIOLATION OF 21 U.S.C. §§ 331(a) & 352**

131.     As part of their duty to exercise reasonable care, Defendants were obligated to follow public laws and regulations enacted to protect the safety of persons such as Plaintiff, Kevin Kruger, including 21 U.S.C. § 331(a), § 352, and other statutes and regulations, which make it unlawful to sell misbranded prescription drug products.

132.     The labeling for Androderm failed to conform to the requirements of 21 U.S.C. § 352, including subsections (a), (c), and (j), and the requirements of 21 C.F.R. § 201.100(c)(1), and, therefore, violated 21 U.S.C. § 331(a), which prohibits the sale of misbranded drugs.

133.     The label and package insert for Androderm is misbranded within the meaning of 21 U.S.C. § 352(a) and (f) because it was false and misleading and failed to give adequate warnings and directions for use by physicians who prescribe Androderm.

134.     Androderm is misbranded pursuant to 21 U.S.C. § 352 because:

(a)     Words, statements, or other information required under that section are not prominently placed with such conspicuousness and in such ways as to render it likely to be read and understood by the ordinary individual or prescriber under customary conditions of purchase and use.

(b)     The labeling does not bear adequate directions for use, and the labeling does not bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage, methods, or application in such manner and form as are necessary for the protection of patients.

27

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

(c)     It is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling.

135.     Because Defendants had a statutory duty under 21 U.S.C. § 352 (a) and (f) not to misbrand Androderm, and because they violated this duty, they are guilty of negligence per se.

136.     Androderm is misbranded pursuant to 21 C.F.R. § 201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading.

137.     Defendants violated 21 C.F.R. § 201.57 because:

(a)     As shown, the labeling was not revised to include a warning as soon as there was reasonable evidence of an association of a serious hazard with the drug (i.e., heart attacks, strokes, and other blood clotting injuries).

(b)     They failed to identify specific tests needed for selection or monitoring of patients who took the prescription drug Androderm. The safety considerations regarding Androderm are such that the drug should be reserved for certain situations, and the Defendants failed to state such information.

(d)     The labeling fails to describe serious adverse reactions and potential safety hazards, and steps that should be taken if they occur.

(e)     The labeling does not state an upper limit dosing beyond which safety and effectiveness have not been established.

138.     Androderm violates 21 C.F.R. § 210.122 because the labeling and packaging materials do not meet the appropriate specifications.

139.     Androderm violates 21 C.F.R. § 310.303 in that it is not safe and effective for its intended use.

140.     Defendants violated 21 C.F.R. § 310.305 and § 314.80 by:

28

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

(a)     Failing to report adverse events associated with Androderm as soon as possible or at least within 15 days of the initial receipt by Defendants of the adverse drug experience.

(b)     Failing to conduct an investigation of each adverse event associated with Androderm, evaluate the cause of the adverse event, submit follow-up reports within the prescribed 15 calendar days of receipt of new information or was requested by the FDA, and keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences.

(c)     Failing to provide periodic reports to the FDA containing (1) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval, (2) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, (3) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated) and/or (4) a copy of the published article from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

141.    Defendants violated 21 C.F.R. § 312.32 because they failed to review all information relevant to the safety of Androderm or otherwise received by Defendants from any sources, including information from any clinical or epidemiological studies, animal studies, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities.

142.    Defendants failed to meet the standard of care set out in these statutes and regulations, which were intended for the benefit of individual consumers such as Plaintiff, Kevin

Kruger, making Defendants liable to Plaintiff. Because each of them violated the duties imposed by these statutes and regulations, they are guilty of negligence per se.

143.  As a direct and proximate result of the actions and inactions of Defendants, Plaintiffs suffered damages, including personal injuries, economic damages, and non-economic damages. Defendants' conduct was further wanton, egregious, and reckless so as to warrant the award of punitive damages.

## NINTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

144.  Plaintiffs incorporate by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

145.  Plaintiff, Heather Kruger, at all times relevant was the lawful wife of Kevin Kruger.

146.  As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through strict liability, negligence or otherwise, Plaintiff Heather Kruger suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this court.

147.  Plaintiffs demand judgment against Defendants for compensatory and punitive damages such as a jury may award, and such other relief as the Court deems just and proper in order to remedy Plaintiff Heather Kruger's loss of consortium.

## TENTH CAUSE OF ACTION
## PUNITIVE DAMAGES ALLEGATIONS

148.  Plaintiffs adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975

149.    The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights, health and safety of Plaintiff Kevin Kruger and other Androderm users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Androderm. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

150.    Prior to the manufacturing, sale, and distribution of Androderm, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiffs and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Androderm.

151.    Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Androderm and failed to warn the public, including Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in Androderm. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Androderm knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

152.    Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with

31

willful and conscious disregard for Plaintiff Kevin Kruger's safety, entitling Plaintiffs to exemplary damages.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A.  General damages in an amount that will conform to proof at time of trial;

B.  Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.  Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.  Medical expenses, past and future, according to proof at the time of trial;

E.  For past and future mental and emotional distress, according to proof;

F.  Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

G.  For punitive or exemplary damages according to proof;

H.  Restitution, disgorgement of profits, and other equitable relief;

I.  Injunctive relief;

J.  Attorney's fees;

K.  For costs of suit incurred herein;

L.  For pre-judgment interest as provided by law; and

M.  For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

32

## **DEMAND FOR JURY TRIAL**

Plaintiff demand a trial by jury on all counts and as to all issues.

Respectfully submitted this 27th day of October, 2014.

GOLDBERG & OSBORNE

/s/ David J. Diamond
David J. Diamond
D. Greg Sakall
Attorneys for Plaintiff

I hereby certify that on the 27th day of October, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

/s/ Kathy Hampton

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite #200
Tucson, AZ 85705
(520) 620-3975